UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MICHAEL WATTS,                                        :

                                                     :        OPINION AND ORDER
                          Plaintiff,                          13 Civ. 5636 (GWG)
                                                     :

        -v.-                                          :

                                                     :

NEW YORK CITY POLICE DEP'T, et al.,                  :

                                                     :

                          Defendants.                :
------------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Michael Watts brought a pro se complaint against the City of New York,

Detective Jose Higa, and Detective James Santana, alleging violations of his constitutional

rights.  Defendants have moved for summary judgment.[1]  The parties consented to having this

matter decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the

following reasons, defendants' motion for summary judgment is granted in part and denied in

part.

---

        [1]  See Notice of Motion, filed Dec. 1, 2014 (Docket # 72) ("Notice of Motion");
Defendants' Declaration in Support of their Motion for Summary Judgment, filed Dec. 1, 2014
(Docket # 73) ("Cooper Decl."); Defendants' Rule 56.1 Statement, filed Dec. 1, 2014 (Docket
# 74) ("56.1"); Defendants' Memorandum of Law in Support of their Motion for Summary
Judgment, filed Dec. 1, 2014 (Docket # 75) ("Def. Mem."); Notice to Pro Se Litigant who
Opposes a Motion for Summary Judgment, filed Dec. 1, 2014 (Docket # 76); Plaintiff Responce
[sic] to a Motion for Summary Judgment, filed Jan. 12, 2015 (Docket # 80) ("Pl. Mem."); Letter
from David Cooper, filed Jan. 23, 2015 (Docket # 81) ("Def. Reply").

I.      BACKGROUND

A.      Facts

The following summary of the facts is based on Watts's sworn pleadings, see Complaint

under the Civil Rights Act, 42 U.S.C. § 1983 (Prisoner Complaint), filed Aug. 8, 2013 (Docket

# 2) ("Compl."); Amend [sic] Complaint # 2, filed Feb. 27, 2014 (Docket # 28) ("FAC");

Amended Complaint under the Civil Rights Act, 42 U.S.C. § 1983 (Prisoner Complaint), filed

Mar. 13, 2014 (Docket # 33) ("SAC");[2] the declaration of Shawntay Major, see Declaration of

Shawntay Major, filed Feb. 27, 2015 (Docket # 88) ("Major Decl."); and Watts's deposition

testimony, see Deposition of Michael Watts, dated Sept. 26, 2014 (annexed in part as Ex. H to

Cooper Decl.) ("Watts Dep.").  We also cite to evidence submitted by defendants where not

contradicted by Watts's evidence.

 On January 11, 2013, Judge Anthony Ferrara of the Criminal Court of the City of New

York signed a search warrant to search Watts's residence, located at 405 Throop Avenue in

Brooklyn.  See Search Warrant, dated Jan. 11, 2013 (annexed as Ex. D to Cooper Decl.)

("Search Warrant").  The search warrant arose from an investigation involving a confidential

informant, who had bought crack cocaine from Watts on two occasions.  See Affidavit in

Support of Search Warrant, dated Jan. 11, 2013 (annexed as Ex. E to Cooper Decl.), ¶¶ 5-9.

At approximately 4:00 a.m. on January 17, 2013, officers of the New York City Police

Department executed the search warrant.  See SAC at 2-3; FAC at 4.  Among the officers present

were Detectives Higa and Santana.  See Search Warrant Plan Pre-Execution (annexed as Ex. F to

---

[2]  "[A] verified pleading . . . has the effect of an affidavit and may be relied upon to
oppose summary judgment."  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d. Cir.
2004) (citations omitted).

Cooper Decl.) ("Tactical Plan").  At this time, it was still dark out, the lights were off in Watts's room, and the curtains were drawn.  Watts Dep. at 32-34.

Watts's first memory upon waking up the morning of January 17, 2013, was of LaQuita Lewis, an acquaintance who was in the room with Watts, telling him that someone was trying to break into the house.  Id. at 31.  Watts admits to being "pretty knocked out" at the time, noting that he might have done cocaine the night before.  Id. at 25-26.  Watts felt "groggy," like he was still dreaming, and he was "not waking up fast enough."  Id. at 34.  Watts saw LaQuita Lewis run through the door going towards the living room.  Id. at 31.  While Watts was still in bed, one of the officers struck Watts in the head three or four times.  Id.; SAC at 3.  After he was hit, Watts fell back on the bed.  Watts Dep. at 38.  An officer told Watts to put his hands behind his back.  Id.  Watts complied, and was then handcuffed.  Id.  During the execution of the search warrant, and following Watts's arrest, the police recovered several grams of crack cocaine in Watts's room.  Id. at 67-68; Arrest Report - K13605169 (annexed as Ex. G to Cooper Decl.), at DEF 1.

While Watts was being arrested, and after he was handcuffed, a police officer, identified by Watts as Higa, "took [Watts's] money and keys out of [his] pants pockets."  SAC at 3; Watts Dep. at 38-39.  The set of "[t]hree or four keys" included keys to Watts's house and car.  Id. at 52.  Instead of "invo[icing] vouchering or returning" the items to Watts, Higa gave them to an individual named Tabitha Lewis.  SAC at 3; see Watts Dep. at 42.  Watts did not give authorization for Tabitha Lewis to receive the keys.  FAC at 4.  While a set of three keys belonging to Watts was vouchered by the New York City Police Department, see NYPD PETS Property Clerk Invoice No. 3000169511, dated Jan. 17, 2013 (annexed as Ex. L to Cooper Decl.), a detective, described as being approximately 6'3" or 6'4" and weighing between 300 lbs.

3

and 350 lbs., apparently told Watts that he "gave them to [Watts's] wife," Watts Dep. at 52-53.

This led to Watts's household property and car being stolen.  FAC at 4.  The theft of property

from his house occurred before he arrived at the precinct.  Watts Dep. at 14, 45; Major Decl. at

1.  The only people who would have had keys to Watts's house or car were Watts and Shawntay

Major.  Watts Dep. at 15, 42-43.  Major did not take the property.  See Watts Dep. at 42-43;

Major Decl. at 1.  Major surmises that Watts's house was robbed by Tabitha Lewis and her sons.

Major Decl. at 1.  Later, an individual identified as "GG" — the girlfriend of one of Tabitha

Lewis's sons — was caught with Watts's stolen car.  SAC at 3; see also Major Decl. at 2 ("[T]he

girl that got caught driving [Watts's] car when it got stolen was Tabitha's son's girlfriend.").

The last time Watts saw the set of keys was when they were removed from his pants pocket by a

police officer.  Watts Dep. at 58.

At approximately 3:06 p.m. on January 17, 2013, Watts was transported from the 79th

Precinct to Manhattan Central Booking.  See OLPA (annexed as Ex. N to Cooper Decl.), at DEF

5; FAC at 4.  At about 12:45 a.m. on January 18, 2013, Watts was transported to New York

Downtown Hospital for medical treatment.  Medical Treatment of Prisoner Form, dated Jan. 17,

2013 (annexed as Ex. P to Cooper Decl.).  Watts was escorted by Police Officer Kenya Bolden

of the Fifth Precinct.  Id.  Watts was admitted to the hospital at approximately 1:10 a.m., where

he complained of swelling to the left side of his head and to his left ear.  New York Downtown

Hospital Documents Report (annexed as Ex. I to Cooper Decl.) ("Hospital Report"), at DEF 134;

Watts Dep. at 61.  Watts reported that he had had a headache for two hours, with ear pain and

dizziness.  Hospital Report at DEF 134-35.  The medical records show that Watts had "mild

ecchymosis on L ear external auricular area" with mild hematoma in his auricular cartilage, as

well as "mild tenderness on [his] temporal area without swelling no hematoma no deformity."

Id. at DEF 135.  Watts reported that "while [he was] getting arrested by police officer, he got hit once on his L side of head/ear."  Id. at DEF 134-35.  Watts was discharged at 10:40 a.m. on January 19, 2013.  Id. at DEF 134.  Upon his discharge, Watts was provided with an "Exitcare® Patient Information" instruction form for a "Bruise (Contusion, Hematoma)."  New York Downtown Hospital Exitcare® Patient Information (annexed as Ex. A to SAC); New York Downtown Hospital Exitcare® Patient Information Discharge Instruction Summary (annexed as Ex. B to SAC).

On January 19, 2013, Watts underwent a new admission examination at the Manhattan Detention Center Clinic.  See NYC Health Correctional Health Services Records, dated Jan. 19, 2013 (annexed as Ex. J to Cooper Decl.), at DEF 270-74.  He was observed to have swelling at the earlobe and reported pain.  Id. at DEF 270.  Watts was seen again on January 31, 2013, at the Brooklyn Detention Center Clinic to follow up on his left ear pain.  Id. at DEF 264-65.  Watts reported some soreness and redness, but said that the swelling had improved.  Id. at DEF 264. At his deposition, Watts testified that the swelling to the left side of his head lasted "[a]bout a week or two.  About a week."  Watts Dep. at 65.  Watts still complains of headaches and memory loss as a result of being hit.  Id. at 62-65.  He has not sought medical treatment for his injury since his visit to New York Downtown Hospital.  Id. at 64-65.

On or about January 23, 2013, Watts pled guilty to N.Y. Penal Law § 220.06(1), criminal possession of a controlled substance in the fifth degree, and was sentenced to nine months imprisonment.  See New York City Department of Probation Pre-Sentence Investigation Fact Sheet, dated Feb. 15, 2013 (annexed as Ex. S to Cooper Decl.), at DEF 202-03; Watts Dep. at 67.

B.    Procedural History

Watts filed his original complaint against two individuals identified as "John Doe" and

5

one individual identified as "Joe." <u>See</u> Compl. at 1-2. Watts filed an amended complaint on February 27, 2014, and a second amended complaint on March 13, 2014, which named the City of New York and Detectives Higa and Santana as defendants. <u>See</u> FAC at 1-3; SAC at 1-2. Liberally construed, Watts's second amended complaint raises the following claims: (1) excessive force, (2) deliberate indifference resulting in delayed medical treatment, and (3) deprivation of property. <u>See</u> SAC at 3. On December 1, 2014, defendants filed a motion for summary judgment. <u>See</u> Notice of Motion. On January 12, 2015, Watts filed a response in opposition to the motion. <u>See</u> Pl. Mem. Defendants filed a reply letter on January 23, 2015. <u>See</u> Def. Reply. In their reply letter, defendants noted that Watts had referred in his opposition papers to statements made by individuals named Shawntay Major and Dana Mitchell, which defendants had never received. <u>Id.</u> at 2 n.1. In response, Watts filed a letter requesting another opportunity to submit these statements. Letter from Michael Watts, filed Feb. 9, 2015 (Docket # 84), at 1. By Order dated February 17, 2015 (Docket # 86), the Court granted Watts's request. Because it appeared that the statements might be delivered to defendants' counsel rather than to the Clerk's Office, the Court ordered defendants to file any such statements they received on ECF. <u>Id.</u> Defendants' counsel informed a law clerk to the undersigned that he had received only the declaration from Shawntay Major, which has been filed, <u>see</u> Major Decl.[3]

_____

[3] Defendants' reply letter also noted that one of Watts's exhibits, entitled "A-1," was not filed along with Watts's response papers but was included in the materials sent to defendants' counsel. Def. Reply at 2. Defendants requested to file the exhibit under seal because it contained "several unsubstantiated allegations against Detective Higa." <u>Id.</u> Defendants also stated that the response papers themselves, as filed by Watts, were incomplete. <u>See id.</u> at 2 n.2. By Order dated January 30, 2015 (Docket # 82), the Court ordered defendants to file on ECF all materials served on them by Watts that were not already docketed and gave defendants permission to file the document identified as Exhibit A-1 under seal.

II.     LAW GOVERNING SUMMARY JUDGMENT MOTIONS

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the non-moving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis and additional citation omitted), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (alteration in original).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with

respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

Because Watts is proceeding pro se, we construe his papers "liberally and interpret them to raise the strongest arguments that they suggest." E.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (citation and internal quotation marks omitted). Nonetheless, "our application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (citation and internal quotation marks omitted); accord Bennett v. James, 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010) ("Notwithstanding the deference to which a pro se litigant is entitled, as well as the deference accorded to a non-movant on a summary judgment motion, [the non-movant] must produce specific facts to rebut the movant's showing and to establish that there are material issues of fact requiring a trial.") (alteration, internal quotation marks, and citations omitted), aff'd, 441 F. App'x 816 (2d Cir. 2011).

III.    DISCUSSION

To establish a claim under 42 U.S.C. § 1983, a plaintiff must show that there has been a denial of a right, privilege, or immunity secured by the Constitution or laws of the United States and that the deprivation of such right occurred under color of state law. See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988). Section 1983 does not in and of itself create any substantive rights; rather, a plaintiff bringing a § 1983 claim must demonstrate a violation of an independent federal constitutional or statutory right. See Chapman v. Hous. Welfare Rights Org., 441 U.S. 600, 617-18 (1979).

A.    Excessive Force

Watts alleges that he was "hit . . . several times in the head with [an] assault riffle [sic]

8

causing injuries to the head and ear" during his arrest.  SAC at 3.  We construe his allegations as making a claim of excessive force under the Fourth Amendment.  We next address defendants' arguments that (1) any force used against Watts during his arrest was reasonable, Def. Mem. at 5-9; (2) Higa is entitled to qualified immunity against Watts's excessive force claim, id. at 10-11; and (3) Santana was not personally involved in the alleged use of excessive force, id. at 11-12.

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (citation omitted).  "[C]laims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard." Brosseau v. Haugen, 543 U.S. 194, 197 (2004) (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)); accord Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014).  "[T]he factfinder must determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (citation omitted).  "Excessive force claims require 'serious or harmful' — not 'de minimis' — use of force." Biswas v. City of New York, 973 F. Supp. 2d 504, 529 (S.D.N.Y. 2013) (quoting Drummond v. Castro, 522 F. Supp. 2d 667, 678-79 (S.D.N.Y. 2007)), appeal dismissed sub nom. Biswas v. Kwait, 576 F. App'x 58 (2d Cir. 2014), as amended (Aug. 28, 2014).

"[D]etermining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Plumhoff, 134 S. Ct. at 2020 (quoting Graham, 490 U.S. at 396).  The court must view

this analysis "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight'" and "'allo[w] for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.'"  Id. (quoting Graham, 490 U.S. at 396-97) (internal citation omitted) (alteration in original).  In conducting this balancing, the court is "guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  Tracy, 623 F.3d at 96 (citing Graham, 490 U.S. at 396; Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)).  "Because this inquiry is necessarily fact-specific, summary judgment is inappropriate 'unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.'"  Codrington v. City of New York, 2015 WL 893567, at *9 (E.D.N.Y. Mar. 2, 2015) (quoting Amnesty Am., 361 F.3d at 123).

> 1.    Reasonable Force

Accepting Watts's version of the events, he was sleeping in his bed when he was woken by LaQuita Lewis telling him that someone was breaking into the house.  Watts Dep. at 31.  Watts was "get[ting] up off the bed" — though he "wasn't even off the bed yet" — when he was struck three or four times by a metal object that he assumed to be a rifle.  Id. at 31, 34, 38.  The blows began before Watts was fully awake.  Id. at 31.

Turning to the three factors cited in Tracy, which derive from the Supreme Court's decision in Graham, we have limited information on the nature and severity of the criminal conduct that led to the encounter.  The search warrant in the record reflects that the officers had information that Watts was selling crack cocaine at the apartment.  See Search Warrant at DEF

10

145.  Given the violence associated with the drug trade, this might cause an officer to expect

danger in executing the search warrant.  Neither of the individual defendants has submitted any

evidence, however, as to their knowledge of Watts's criminal activity at the time of the search.

Indeed, the defendants here have elected not to submit <u>any</u> sworn testimony from either

themselves or any of the police officers who were present.[4]

The remaining two factors strongly favor Watts.  Watts was still on his bed and not

making any aggressive movements, and thus imposed no immediate threat to the safety of the

officers.  Obviously, neither was Watts resisting arrest or attempting to flee.  Thus, under

Watts's version of events, the blows were completely unnecessary.

Defendants argue that there is "no substantive distinction" between the facts here and

those in <u>Tracy</u>.  Def. Mem. at 7.  <u>Tracy</u>, however, presented far different circumstances.  In

<u>Tracy</u>, the officer had pulled Tracy over as part of a roadside stop at night.  623 F.3d at 93.

Tracy lied to the officer about his identity and the officer "strongly suspected that Tracy might

be wanted in connection with a criminal offense."  <u>Id.</u>  The officer ordered Tracy to place his

hands on his head and after Tracy complied, the officer ordered him to turn around.  <u>Id.</u>  As

Tracy was turning, he made a sudden movement to grab hold of his car because he had just

slipped on a patch of ice.  <u>Id.</u>  The officer then struck Tracy with his flashlight twice in the head.

<u>Id.</u>

---

[4]  Defendants have included a document they identify as a criminal complaint against
Watts that they contend includes "Detective Higa's account of the events that transpired in the
moments leading up to plaintiff's arrest."  Cooper Decl. ¶ 19; <u>see</u> Felony Criminal Complaint
(annexed as Ex. Q to Cooper Decl.).  The document they have submitted is unsigned, however,
and thus we do not consider it.  Nor do we consider the unsworn hearsay statements from the
files created by the Civilian Complaint Review Board ("CCRB") recounting Higa's version of
the events.  <u>See</u> CCRB Case File No. 201300914 Records (annexed as Ex. K to Cooper Decl.)
("CCRB File"), at DEF 37.

In ruling the force was reasonable as a matter of law, the Second Circuit emphasized that Tracy "appeared to fail to comply with a direct order and to instead actively resist arrest, thus necessitating a forceful response." Id. at 97; see also id. ("Tracy's sudden movement constituted non-compliant and threatening behavior") (citation omitted). Here, by contrast, there was no direct order to Watts at all, let alone one that the officer might have perceived as being disobeyed. Thus, it is pure speculation to rule that a reasonable jury would have to find that Higa believed Tracy's act of getting out of bed constituted an attempt to resist arrest or flee. Other differences between Tracy and the instant case are that Tracy was assumed to be a fugitive and that the officer there was without any "back up." Id. Here, there was no reason to suspect that Watts was fleeing and the officers apparently had copious backup, as the Tactical Plan indicates that at least 15 individuals were to be involved in the search warrant's execution. See Tactical Plan.

Defendants argue that Watts's injuries were de minimis, and that this is "further proof that the force used was reasonable." Def. Mem. at 9. However, "the fact that [the] [p]laintiff may not have sustained serious long lasting harm is not dispositive." Graham v. City of New York, 928 F. Supp. 2d 610, 618 (E.D.N.Y. 2013) (citations omitted). The Court recognizes that, in Tracy, the fact that the injuries were minor — consisting of a small "laceration or abrasion" — supported the Court's conclusion that the use of force was "a reasonable and proportionate response under the circumstances." 623 F.3d at 97. Here, by contrast, the injuries consisted of bruising and swelling that lasted a week accompanied by pain and continuing headaches. See SAC at 3; Watts Dep. at 62-65; Hospital Report at DEF 134-35. In light of the allegedly gratuitous nature of the blows administered by the officer, the fact that Watts may not have sustained serious injuries would not require a jury to find that the officer had used reasonable

12

force.  See Hayes v. N.Y.C. Police Dep't, 212 F. App'x 60, 62 (2d Cir. 2007) ("[W]e have

permitted claims to survive summary judgment where the only injury alleged is bruising.")

(citations omitted); Hayes v. Cnty. of Sullivan, 853 F. Supp. 2d 400, 432 (S.D.N.Y. 2012)

("Plaintiff need not show 'permanent or severe' injuries to maintain an excessive force claim")

(quoting Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987)).

>    2.    Qualified Immunity

Defendants argue that Higa is entitled to qualified immunity from suit because

"preexisting law [has] upheld the reasonableness of striking a plaintiff who was apparently

resisting arrest."  Def. Mem. at 11.  As was stated by the Second Circuit in Munafo v.

Metropolitan Transportation Authority, 285 F.3d 201 (2d Cir. 2002):

> A government official sued in his individual capacity is entitled to qualified
> immunity (1) if the conduct attributed to him was not prohibited by federal law,
> see, e.g., Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998); Siegert v.
> Gilley, 500 U.S. 226, 232 (1991); or (2) where that conduct was so prohibited, if
> the plaintiff's right not to be subjected to such conduct by the defendant was not
> clearly established at the time it occurred, see, e.g., Harlow v. Fitzgerald, 457
> U.S. 800, 817-19 (1982); or (3) if the defendant's action was "objective[ly]
> legal[ly] reasonable[] . . . in light of the legal rules that were clearly established at
> the time it was taken."  Anderson v. Creighton, 483 U.S. 635, 639 (1987) (internal
> quotation marks omitted); see Harlow v. Fitzgerald, 457 U.S. at 819.

Munafo, 285 F.3d at 210 (alterations and ellipsis in original); accord Alali v. DeBara, 2008 WL

4700431, at *5 (S.D.N.Y. Oct. 24, 2008).  However, in the excessive force context, "[s]ummary

judgment should not be granted on the basis of a qualified immunity defense premised on an

assertion of objective reasonableness unless the defendant 'show[s] that no reasonable jury,

viewing the evidence in the light most favorable to the Plaintiff, could conclude that the

defendant's actions were objectively unreasonable in light of clearly established law.'"  O'Bert

ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003) (quoting Ford v. Moore, 237

F.3d 156, 162 (2d Cir. 2001)) (alteration in original) (additional citations omitted); accord O'Brien v. Barrows, 556 F. App'x 2, 4 (2d Cir. 2014).  For the reasons already discussed, a reasonable jury could conclude that the amount of force used was not objectively reasonable in light of the law governing the use of force.  Accordingly, Higa is not entitled to qualified immunity on Watts's excessive force claim.

3.    Personal Involvement

Defendants argue that Watts's "excessive force claim against Detective Santana must be dismissed as a matter of law" because Watts "offers no tangible connection to suggest Detective Santana's personal involvement in the force used against [Watts]."  Def. Mem at 11.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation."  Grullon v. City of New Haven, 720 F.3d 133, 138-39 (2d Cir. 2013) (citations omitted); accord Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004) ("[I]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (citation omitted).  Thus, a claim against an official in his individual capacity under § 1983 will fail if the plaintiff fails to establish the personal involvement of the defendant.  See Koehl v. Dalsheim, 85 F.3d 86, 89 (2d Cir. 1996) (citing Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir. 1989)); accord Patterson, 375 F.3d at 229.  "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so."  Russo v. DiMilia, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012) (citation and internal quotation marks omitted); see also Biggs v. City of New York, 2010 WL 4628360, at *6

14

n.12 (S.D.N.Y. Nov. 16, 2010) ("A police officer is personally involved in the use of excessive force if he or she either: (1) directly participates, . . . or (2) fails to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (citations and internal quotation marks omitted).

Watts's pleadings assert that it was Santana who hit him in the head. SAC at 3; FAC at 4. However, he has no personal knowledge that allows him to make this assertion. Watts admitted at his deposition that the room was dark when he was struck and he was unable to describe the person who hit him. Watts Dep. at 32-33. The only reason Watts asserts the individual was Santana is because of Watts's reading of the Tactical Plan. See id. at 38 (the Tactical Plan "is the only thing [he] can go on"); id. at 37 (Watts "ha[d] to rely on the tact[ical] plan to say who entered the room first and things of that nature"). The Tactical Plan shows that a pair of detectives, which included Santana, were to use equipment identified as "ram" and "rabbit." Tactical Plan. Santana's "specific assignment" was "rabbit/cuff &toss" while the other detective's assignment was "ram/cuff &toss/front security." Id. At his deposition, Watts testified that he believed that because Santana's "position was ram and rabbit, he would be the first person in the room. From my understanding, that would be the first person that comes through the door." Watts Dep. at 37. This statement, however, constitutes mere speculation about the meaning of the Tactical Plan. Moreover, the Tactical Plan actually assigns two separate pairs of detectives to the "ram and rabbit" position, and the "specific assignment" and "equipment" of each pair is identical. See Tactical Plan. Thus, the Tactical Plan is insufficient evidence to allow the inference that Santana — rather than any of the other three officers — was the person who came into contact with Watts. That is, no reasonable juror could conclude based on this evidence that the unidentified person who hit Watts was Santana. Nor would there be

15

any basis for a jury to find that Santana failed to intercede on Watts's behalf given that Watts testified that the only officer in the room at the time the incident occurred was "the one that hit [him] with the rifle."  Watts Dep. at 32.

Moreover, Higa, through his attorney's submissions, has admitted that he was the person who came into contact with Watts in the room on the day of the search.  Def. Mem. at 12 ("Higa readily admits that he was the only person in the room with [Watts] at the time the force allegedly occurred.") (citing 56.1 ¶¶ 6, 50-51); see CCRB File at DEF 37, 118.

Accordingly, defendants' motion for summary judgment is granted as to Watts's claim of excessive force against Santana, and denied as to Watts's claim of excessive force against Higa.

B.    Delayed Medical Treatment

"The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police."  Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  "While in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection . . . ."  Kelsey v. City of New York, 306 F. App'x 700, 702 (2d Cir. 2009) (citing Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000); Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)).  "Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need."  Weyant, 101 F.3d at 856 (citation omitted).

Because he was a pretrial detainee, Watts's claims under the Fourteenth Amendment are analyzed under the same standard as an Eighth Amendment claim for deliberate indifference.  Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009).  This standard "embodies both an objective

16

and a subjective prong": "[o]bjectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists," and "[s]ubjectively the charged official must act with a sufficiently culpable state of mind." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (internal citations and quotation marks omitted). "[T]he [detainee] must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.'" Braxton v. Nichols, 2010 WL 1010001, at *3 (S.D.N.Y. Mar. 18, 2010) (quoting Helling v. McKinney, 509 U.S. 25, 36 (1993)). A sufficiently culpable state of mind "'entails something more than mere negligence . . . but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Hathaway, 99 F.3d at 553 (quoting Farmer v. Brennan, 511 U.S. 825, 835 (1994)) (alterations in original). The Second Circuit has described the standard as being equivalent to criminal recklessness — when the official "'knows of and disregards an excessive risk to [detainee] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer, 511 U.S. at 837) (additional citation omitted); see also Cuoco, 222 F.3d at 106-07 (applying the deliberate indifference standard in the context of an action brought under the Due Process Clause of the Fifth Amendment).

Viewing the facts in the light most favorable to Watts, no reasonable jury could find that Higa or Santana's conduct met this standard. Watts's arrest occurred at approximately 4:00 a.m. on January 17, 2013. SAC at 2. Watts concedes he received medical treatment when he was transferred to New York Downtown Hospital at approximately 1:10 a.m. on January 18, 2013. Watts Dep. at 61, 64; Hospital Report at DEF 134. Where a plaintiff's claim is "based on a temporary delay or interruption in treatment, the serious medical need inquiry can properly take

into account the severity of the temporary deprivation alleged by the [detainee]."  Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003) (citations and footnote omitted).  "[I]t's the particular risk of harm faced by a [detainee] due to the challenged deprivation of care, rather than the severity of the [detainee's] underlying medical condition, considered in the abstract, that is relevant . . . ."  Id. (citations omitted).  "The absence of adverse medical effects or demonstrable physical injury is one . . . factor that may be used to gauge the severity of the medical need at issue.  Indeed, in most cases the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the [detainee] to a significant risk of serious harm."  Id. at 187 (footnote and internal citations omitted).

Here, Watts has not shown that his injuries placed him at risk of future harm that was "so grave that it violate[d] contemporary standards of decency."  Helling, 509 U.S. at 36; Braxton, 2010 WL 1010001, at *3 (citation omitted).  Indeed, Watts does not allege that the delay in providing medical care resulted in any injury to him whatsoever.  Even when he finally received medical treatment at New York Downtown Hospital, he was treated only for relatively minor injures — bruising, swelling, and a moderate headache.  Watts Dep. at 61; Hospital Records at DEF 134-36.  "[C]ourts in this district have held that terrible and extreme headaches and swelling do not satisfy the objective component of" the deliberate indifference inquiry.  Sledge v. Bernstein, 2012 WL 4761582, at *5 (S.D.N.Y. Aug. 2, 2012) (citing cases).  Cases have specifically held that bruising is also not sufficiently serious under this standard.  See, e.g., Rodriguez v. Mercado, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (allegations of bruising to the plaintiff's head, back, and wrists did not amount to a serious injury where he did not lose consciousness and was alert and responsive during a medical examination).  There is no

evidence that Watts's head injuries were so severe so as to show at that time a "condition of urgency . . . that may produce death, degeneration, or extreme pain." Hathaway, 99 F.3d at 553 (citations and internal quotation marks omitted).  Nor is there any evidence that Watts complained of such a condition to the officers when he was trying to obtain medical treatment.

In sum, the evidence before the Court would not allow a reasonable jury to conclude that Watts had demonstrated the objective prong of a deliberate indifference claim.  Thus, we grant defendants' motion for summary judgment as to Watts's claim for deliberate indifference resulting in delayed medical treatment.

C.      Deprivation of Property

Watts alleges that Higa removed money and keys from Watts's pocket during his arrest, failed to provide a voucher, receipt, or invoice for these items, failed to return the items to Watts, and then subsequently gave the keys to an individual named Tabitha Lewis.  See SAC at 3; FAC at 4.  As for damages, Watts asserts that his house was subsequently robbed and vandalized, and his car was stolen.  See SAC at 3; FAC at 4; Compl. at 3.  Construing these allegations to assert claims under the Fourteenth Amendment for deprivation of property without due process of law, the claims are rejected.  "[I]ntentional deprivations do not violate [the Due Process Clause] provided . . . that adequate state post-deprivation remedies are available." Hudson v. Palmer, 468 U.S. 517, 533 (1984).  Thus, a claim for deprivation of property "cannot be brought in federal court if the relevant state court provides an adequate remedy for the deprivation of [the property at issue]." Key v. Tanoury, 2006 WL 3208548, at *2 (S.D.N.Y. Nov. 3, 2006) (citations omitted).

The Second Circuit has held that "an adequate post-deprivation remedy is a defense to a Section 1983 due process claim only where the deprivation is random and unauthorized," but not

19

"where the deprivation complained of results from the operation of established state procedures." Butler v. Castro, 896 F.2d 698, 700 (2d Cir. 1990) (citation omitted); accord Dove v. City of New York, 2000 WL 342682, at *2 (S.D.N.Y. Mar. 30, 2000) ("Deprivation of property by a state actor, whether intentional or negligent, does not give rise to a claim under § 1983 so long as the law of that state provides for an adequate post-deprivation remedy and the deprivation was the result of a random and unauthorized act.") (citations and internal quotation marks omitted). Here, there is no evidence suggesting that there is any infirmity in the established procedures used by the City of New York or the New York City Police Department in seizing property from individuals at the time of their arrests.  Accordingly, the only remaining question is whether New York has provided an adequate post-deprivation remedy.

"Where loss of property was 'random and unauthorized,' courts have found that 'New York provides an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, or conversion . . . .'" Cantave v. N.Y.C. Police Officers, 2011 WL 1239895, at *7 (E.D.N.Y. Mar. 28, 2011) (quoting Dove, 2000 WL 342682, at *3) (ellipsis in original) (additional citations omitted); accord Omar v. City of New York, 2015 WL 857587, at *8 (S.D.N.Y. Feb. 27, 2015).  Watts's "failure to take advantage of the state procedures does not convert his cause of action into a constitutional due process claim."  Smith v. O'Connor, 901 F. Supp. 644, 647 (S.D.N.Y. 1995) (citing Franco v. Kelly, 854 F.2d 584, 588 (2d Cir. 1988)); accord Omar, 2015 WL 857587, at *8.  Because Watts had access to these remedies, this claim must fail.

D.    Monell Claim

Watts also asserts a claim under 42 U.S.C. § 1983 against the City of New York. Defendants argue that Watts has failed to state a claim against the City of New York because

Watts has failed to submit any evidence or make any allegations about the policies and practices of the City of New York.  Def. Mem. at 20.

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).

> In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.

Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citing Monell, 436 U.S. at 690-91). Thus, "[u]nder the standards of Monell, a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality."  Jones v. Town of E. Haven, 691 F.3d 72, 80 (2d Cir. 2012) (internal citations omitted); accord Alvarado v. Westchester Cnty., 22 F. Supp. 3d 208, 218 (S.D.N.Y. 2014) ("A municipality such as the County may be held liable under Section 1983 only when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.") (quoting Monell, 436 U.S. at 694) (alteration in original) (internal quotation marks omitted).  "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee."  Jones, 691 F.3d at 80 (citing Monell, 436 U.S. at 691) (additional citations omitted).  "The policy or custom need not be memorialized in a specific rule or regulation."  Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) (citing Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992)).  However, "isolated acts" by non-policymaking municipal employees are "generally not sufficient to demonstrate a municipal

custom, policy, or usage that would justify municipal liability." Jones, 691 F.3d at 81 (citations omitted).

Defendants assert that there is no evidence, or even allegation, that the City of New York meets the Monell criteria for liability.  See Def. Mem. at 20-21.  They point to an absence of any evidence in the record that might establish that the alleged constitutional injuries were the result of a policy or practice of the City of New York, or that any individual's actions were carried out pursuant to such a policy or practice.  See id.  Where a nonmoving party bears the burden of proof on an issue, it is sufficient for the party moving for summary judgment to "point[] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  The moving party may use a memorandum or brief to "point to" the absence of evidence and thereby shift to the nonmovant the obligation to come forward with admissible evidence supporting its claim.  E.g., Feurtado v. City of New York, 337 F. Supp. 2d 593, 599 (S.D.N.Y. 2004) (citations omitted).  Because Watts bears the burden of proving his Monell claim, see Miner v. City of Glens Falls, 999 F.2d 655, 660 (2d Cir. 1993), defendants' assertion in their memorandum of law that there is no evidence of a Monell violation required Watts to furnish admissible evidence in support of his claim, see, e.g., Celotex, 477 U.S. at 322.

A plaintiff's "[c]onclusory allegations of municipal liability will not defeat a motion for summary judgment on a Monell claim."  Jouthe v. City of New York, 2009 WL 701110, at *8 (E.D.N.Y. Mar. 10, 2009) (alteration in original) (citations and internal quotation marks omitted).  Here, Watts has submitted no evidence on this topic at all.  While Watts has submitted some evidence that Officer Higa violated his constitutional rights, this does not result in Monell liability given that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by

22

an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." City of Okla. City v. Tuttle, 471 U.S. 808, 823-24 (1985); see Plair v. City of New York, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) ("[I]t is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage.") (internal quotation marks omitted) (citing cases).

Accordingly, Watts's claim against the City of New York under § 1983 must be dismissed.

IV.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Docket # 72) is granted in part and denied in part. Specifically, defendants' motion for summary judgment is granted as to all of Watts's claims except for his excessive force claim against Detective Higa.

SO ORDERED.

Dated: April 29, 2015
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

Michael Watts
c/o Ivy Jenkings
3 West 137th Street
Apt. #2C
New York, NY 10037

23